1

2

3

4

5

6

7

8           IN THE UNITED STATES DISTRICT COURT

9           FOR THE EASTERN DISTRICT OF CALIFORNIA

10   DENNIS LOUIS NELSON,

11           Petitioner,               No. 2:09-cv-2793 WBS KJN P

12       vs.

13   GARY SWARTHOUT,

14           Respondent.               FINDINGS AND RECOMMENDATIONS

15   _____/

16   I.  Introduction

17           Petitioner is a state prisoner, proceeding without counsel, with an application for a

18   writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2004 conviction

19   for first degree murder.  Petitioner was sentenced to life in prison, with the possibility of parole.

20   Petitioner raises four claims in his petition, filed October 7, 2009, that his prison sentence

21   violates the Constitution.  For the reasons set forth below, the undersigned recommends that the

22   petition be denied.

23   II.  Procedural History

24           On June 18, 2004, a jury found petitioner guilty of first degree murder.

25   Petitioner was sentenced to a term of life with the possibility of parole.

26   ////

1

1          Petitioner filed a timely appeal and on August 31, 2006, in a partially published

2   opinion, the California Court of Appeal for the Third Appellate District affirmed the judgment.

3   People v. Nelson, 142 Cal. App. 4th 696 (Lodged Document "LD" D, App. A).[1]

4          Petitioner filed a timely petition for review in the California Supreme Court.  (LD

5   D.)  The court granted review on three questions:

6          1) Did the delay in charging defendant violate his state and
    federal constitutional rights? (2) Does the methodology for

7   assessing the statistical significance of a "cold hit" from a DNA
    database require proof of general scientific acceptance? (3) How

8   should the statistical significance of a "cold hit" from a DNA
    database be calculated?

9

10  People v. Nelson, 43 Cal. 4th 1242, 1249 (2008).  On June 16, 2008, in a published opinion, the

11  California Supreme Court affirmed.   Id. at 1268 (LD I at 24).   On October 6, 2008, the United

12  States Supreme Court denied petitioner's petition for writ of certiorari.  Nelson v. California, 129

13  S. Ct. 357 (2008).

14         Petitioner filed no petitions for writ of habeas corpus in the state courts.

15  III.  Facts[2]

16         In the late afternoon of February 23, 1976, Ollie George, a
    19–year–old college student, drove her brother's car to a shopping

17  center in Sacramento to buy some nylons. Around 5:30 p.m., she
    told her mother by telephone that the car would not start. Around

18  that time, she was seen at a nearby McDonald's restaurant. Later
    the car was found unattended at the shopping center, with the door

19  unlocked and the keys in the ignition. The car contained grocery
    items, nylons, Ollie's purse, and a partially eaten McDonald's

20  hamburger. Ollie was missing. Her family notified the police that
    she was missing, and her disappearance was reported in the

21

22     [1]  Respondent lodged the state court record herein on March 18, 2010.   Because the
    Court of Appeal opinion was only partly published, this court refers to the version lodged herein

23  rather than to the published version.  Lodged Document D is petitioner's Petition for Review by
    the California Supreme Court.  Appendix A to that document contains the full opinion of the

24  California Court of Appeal.

25     [2]  The facts are taken from the opinion of the California Supreme Court.  People v.
    Nelson, 43 Cal. 4th 1242, 1247-48 (2008) (LD I).   These facts are quoted from that court's

26  opinion, with the exception of replacing the word "defendant" with the word "petitioner."

newspaper and on television. Two people said they had observed Ollie inside a car at the shopping center around the time she disappeared. The hood was open, and a man described as African–American appeared to be working on the engine. One witness said the man was wearing a "watch cap."

Two days later, Ollie's body was found in an unincorporated area of Sacramento County. She had been raped and drowned in mud.

Within a couple of weeks, one of the witnesses saw what he believed to be the same car in which he had seen Ollie around the time she disappeared. He reported the license number to the police. The car was petitioner's faded blue Oldsmobile F85. In early March 1976, sheriff's detectives observed petitioner and his car in an apartment parking lot. He was wearing a watch cap. He agreed to go to the sheriff's department for an interview. There, he gave a rather confused account of his whereabouts at the time Ollie disappeared.  Petitioner's mother-in-law said that petitioner was at her house sometime between 4:00 and 6:00 p.m. on the day Ollie disappeared, but she also said that petitioner never stayed long at her house.

During the investigation, detectives received hundreds of tips, including reports that Ollie, or at least a woman who, like Ollie, was African–American, was seen with a Caucasian male or males. Detectives interviewed over 180 potential witnesses and followed other leads. However, they were unable to develop sufficient evidence to focus the investigation on a specific person. Eventually, the matter became a cold case, that is, unsolved but inactive.

In later years, for unrelated events, petitioner was convicted of criminal offenses, including rape and forcible oral copulation, and was sentenced to a lengthy prison term. A biological sample was obtained from him for DNA analysis and entry into the state convicted offender databank.

In October 2000, the state allocated funds to enable local law enforcement agencies to utilize DNA to solve sexual assault cases that lacked suspects. Sacramento County began hiring and training analysts, a process that takes about a year. At that time, the county had about 1,600 unsolved sexual assault cases. In July 2001, a review of Ollie George's death determined that the case had biological evidence warranting analysis. The case was put in line for DNA analysis. The evidence included a vaginal swab, semen stains on Ollie's sweater, and Ollie's hair samples obtained during the autopsy. An analyst used part of a semen stain from the sweater to develop a DNA profile. The state Department of Justice obtained that profile for comparison, by computer, with the state's convicted offender databank. At the time, the databank contained

1   about 184,000 individual profiles. The search resulted in a match
    with one of the persons in the databank. Petitioner was that person,
2   and he was identified as a potential source of the semen stain.

3          In 2002, with a warrant, detectives obtained oral swabs
    from petitioner, which were analyzed with Ollie's vaginal swab, the
4   semen stains on her sweater, and her hair samples.  Petitioner's
    DNA matched the DNA of each of the evidence samples. As a
5   result, petitioner was charged with Ollie's first degree murder.
    Before trial, petitioner moved unsuccessfully to have the matter
6   dismissed due to the delay in charging him with the murder. . . .  At
    trial, over objection, the prosecution presented evidence that the
7   DNA profile on the vaginal swab would occur at random among
    unrelated individuals in about one in 950 sextillion
8   African–Americans, one in 130 septillion Caucasians, and one in
    930 sextillion Hispanics. There are 21 zeros in a sextillion and 24
9   zeros in a septillion. . . .

10         In view of the DNA evidence, the defense did not deny that
    petitioner had sexual intercourse with Ollie. Rather, the defense
11  claimed that Ollie and petitioner had consensual intercourse on the
    weekend before she disappeared, and that someone else abducted,
12  raped, and murdered her.

13  43 Cal. 4th at 1247-49.

14  IV.  Standards for a Writ of Habeas Corpus

15         An application for a writ of habeas corpus by a person in custody under a

16  judgment of a state court can be granted only for violations of the Constitution or laws of the

17  United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the

18  interpretation or application of state law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991);

19  Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).

20         Federal habeas corpus relief is not available for any claim decided on the merits in

21  state court proceedings unless the state court's adjudication of the claim:

22         (1) resulted in a decision that was contrary to, or involved an
           unreasonable application of, clearly established Federal law, as
23         determined by the Supreme Court of the United States; or

24         (2) resulted in a decision that was based on an unreasonable
           determination of the facts in light of the evidence presented in the
25         State court proceeding.

26  28 U.S.C. § 2254(d).

4

1          Under section 2254(d)(1), a state court decision is "contrary to" clearly

2   established United States Supreme Court precedents if it applies a rule that contradicts the

3   governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially

4   indistinguishable from a decision of the  Supreme Court and nevertheless arrives at different

5   result.  Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-06

6   (2000)).

7          Under the  "unreasonable application" clause of section 2254(d)(1), a federal

8   habeas court may grant the writ if the state court identifies the correct governing legal principle

9   from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the

10  prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ

11  simply because that court concludes in its independent judgment that the relevant state-court

12  decision applied clearly established federal law erroneously or incorrectly.  Rather, that

13  application must also be unreasonable."  Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75

14  (2003) (it is "not enough that a federal habeas court, in its independent review of the legal

15  question, is left with a 'firm conviction' that the state court was 'erroneous.'") (internal citations

16  omitted).  "A state court's determination that a claim lacks merit precludes federal habeas relief

17  so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."

18  Harrington v. Richter, 131 S. Ct. 770, 786 (2011).

19          The court looks to the last reasoned state court decision as the basis for the state

20  court judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  If there is no reasoned

21  decision, "and the state court has denied relief, it may be presumed that the state court

22  adjudicated the claim on the merits in the absence of any indication or state-law procedural

23  principles to the contrary."  Harrington, 131 S. Ct. at 784-85.  That presumption may be

24  overcome by a showing that "there is reason to think some other explanation for the state court's

25  decision is more likely."  Id. at 785 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

26  ////

1   Where the state court reaches a decision on the merits but provides no reasoning

2   to support its conclusion, the federal court conducts an independent review of the record.

3   "Independent review of the record is not de novo review of the constitutional issue, but rather,

4   the only method by which we can determine whether a silent state court decision is objectively

5   unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  Where no reasoned

6   decision is available, the habeas petitioner has the burden of "showing there was no reasonable

7   basis for the state court to deny relief." Harrington, 131 S. Ct. at 784.  "[A] habeas court must

8   determine what arguments or theories supported or, . . . could have supported, the state court's

9   decision; and then it must ask whether it is possible fairminded jurists could disagree that those

10  arguments or theories are inconsistent with the holding in a prior decision of this Court." Id. at

11  786.

12  V.  Petitioner's Claims

13      A.  Claim 1 - Alleged Due Process Violation from Delay in Bringing Charges

14          Petitioner argues that the 26 ½-year delay in bringing charges prejudiced his

15  ability to prepare a defense and deprived him of due process.  For the reasons set forth below,

16  petitioner has not shown the California Supreme Court's opinion on this issue was contrary to or

17  an unreasonable application of federal law.  This court recommends denial of this due process

18  claim.

19          1.  Federal Law

20          The United States Supreme Court held in 1971 that a defendant may assert a

21  constitutional violation for pre-indictment delay under the Due Process Clause, but not under the

22  speedy trial guarantee of the Sixth Amendment.  United States v. Marion, 404 U.S. 307 (1971).

23  The Court held the defendant had not established a due process violation in that case because,

24  "[n]o actual prejudice to the conduct of the defense is alleged or proved, and there is no showing

25  that the Government intentionally delayed to gain some tactical advantage over appellees or to

26  harass them." Id. at 325.  Several years later, the Court confirmed that "proof of prejudice is

6

generally a necessary but not sufficient element of a due process claim, and that the due process

inquiry must consider the reasons for the delay as well as the prejudice to the accused."  United

States v. Lovasco, 431 U.S. 783, 790 (1977); see also United States v. Valenzuela-Bernal, 458

U.S. 858, 868-69 (1982).

The Court has stressed that the reason for the prosecutor's delay is important:

> In our view, investigative delay is fundamentally unlike
> delay undertaken by the Government solely "to gain tactical
> advantage over the accused," precisely because investigative delay
> is not so one-sided.  Rather than deviating from elementary
> standards of "fair play and decency," a prosecutor abides by them if
> he refuses to seek indictments until he is completely satisfied that
> he should prosecute and will be able promptly to establish guilt
> beyond a reasonable doubt. Penalizing prosecutors who defer
> action for these reasons would subordinate the goal of "orderly
> expedition" to that of "mere speed."  This the Due Process Clause
> does not require. We therefore hold that to prosecute a defendant
> following investigative delay does not deprive him of due process,
> even if his defense might have been somewhat prejudiced by the
> lapse of time.

Lovasco, 431 U.S. at 2051-52 (internal citations and footnote omitted).  In fact, the Court has

described this standard for evaluating delay as a particularly difficult one for a petitioner to meet:

"such claims can prevail only upon a showing that the Government delayed seeking an

indictment in a deliberate attempt to gain an unfair tactical advantage over the defendant or in

reckless disregard of its probable prejudicial impact upon the defendant's ability to defend against

the charges."  United States v. $8,850, 461 U.S. 555, 563 (1983); see also United States v.

Gouveia, 467 U.S. 180, 192 (1984).  However, the Court has also declined to set a clear standard

for determining when the Due Process Clause is violated for pre-indictment delay:

> In Marion we conceded that we could not determine in the
> abstract the circumstances in which preaccusation delay would
> require dismissing prosecutions. More than five years later, that
> statement remains true. Indeed, in the intervening years so few
> defendants have established that they were prejudiced by delay that
> neither this Court nor any lower court has had a sustained
> opportunity to consider the constitutional significance of various
> reasons for delay.  We therefore leave to the lower courts, in the
> first instance, the task of applying the settled principles of due

1    process that we have discussed to the particular circumstances of
     individual cases.
2

3    Id. at 2052 (citation and footnote omitted).

4           The Court of Appeals for the Ninth Circuit has held that a defendant must first

5    show "actual, non-speculative prejudice from the delay." United States v. Corona-Verbera, 509

6    F.3d 1105, 1112 (9th Cir. 2007).  Showing actual prejudice is a "'heavy burden' that is rarely

7    met." Id. (quoting United States v. Huntley, 976 F.2d 1287, 1290 (9th Cir. 1992)).  "Generalized

8    assertions of the loss of memory, witnesses, or evidence are insufficient to establish actual

9    prejudice.  Consequently, [a defendant] must show both that lost testimony, witnesses, or

10   evidence meaningfully has impaired his ability to defend himself, and [t]he proof must

11   demonstrate by definite and non-speculative evidence how the loss of a witness or evidence is

12   prejudicial to [his] case." Id. (internal quotation marks and citations omitted).  Once the

13   defendant shows actual prejudice, he must next show this prejudice outweighs the reasons for the

14   delay and that the delay "offends those 'fundamental conceptions of justice which lie at the base

15   of our civil and political institutions.'" Id. (quoting United States v. Sherlock, 962 F.2d 1349,

16   1353-54 (9th Cir. 1989)).

17                  2.  California Supreme Court Opinion

18          After reviewing Marion, Lovasco, United States v. $8,850, and Gouveia, the

19   California Supreme Court found federal courts had not established a clear standard for

20   determining when pre-complaint delay violates federal due process standards.  In particular,

21   federal law was not entirely clear whether a challenge to a pre-complaint delay must include a

22   showing "'that the delay was undertaken to gain a tactical advantage over the defendant.'"  43

23   Cal. 4th at 1251 (quoting People v. Catlin, 26 Cal. 4th 81, 107 (2001)).  The Court determined

24   that regardless of the exact contours of federal law, it was clear the state law standard was more

25   favorable to the defendant than the federal standard.  Id. at 1251.  Therefore, the Court's

26   determination that the delay in charging petitioner did not violate the state Constitution was

8

1   necessarily a determination that the delay did not violate the federal Constitution either.  Id.

2   Under the state due process standard, petitioner would prevail if he showed the prejudice he

3   suffered from the delay outweighed the prosecution's justification for the delay.  Id. at 1255-56.

4          The California Supreme Court first held it would not presume prejudice based on

5   the length of the pre-complaint delay.  43 Cal. 4th at 1250.  "Presuming prejudice would be

6   inconsistent with the Legislature's declining to impose a statute of limitations for murder, among

7   the most serious of crimes. To avoid murder charges due to delay, the defendant must

8   affirmatively show prejudice."  Id.

9          The California Supreme Court next examined whether petitioner suffered actual

10  prejudice as a result of the delay.  It noted that the Court of Appeal had "meticulous[ly]"

11  considered every basis upon which petitioner claimed prejudice. 43 Cal. 4th at 1250-51.  A

12  review of the Court of Appeal opinion confirms that conclusion.  The Court of Appeal went

13  through each of the following allegations of prejudice: (1) unavailability of witnesses; (2) failure

14  of witnesses' memories; (3) loss of photographs; (4) loss of evidence; (5) loss of alibi evidence;

15  (6) unavailability of evidence necessary for pretrial motions; (7) lost opportunity for concurrent

16  sentencing; and (8) lost opportunity to be charged with a lesser offense. (LD D, App. A, at 14-

17  28.)  When it found petitioner made an allegation of prejudice that had some potential for being

18  material, the court examined that allegation in detail.  For example, the court specifically

19  examined the potential for prejudice from the unavailability of seven witnesses and discussed a

20  number of items of missing evidence. (LD D, App. A, at 15-19, 21-24.)  The state high court

21  agreed with the Court of Appeal's conclusion that petitioner "'demonstrated some prejudice

22  sufficient to require the prosecution to justify the preaccusation delay, but the prejudice was

23  minimal.'"  Id. at 1250 (quoting LD D, App. A, at 13.)

24         The California Supreme Court next held the prosecutor's reasons for the 26 ½-

25  year delay were legitimate and justified:

26  ////

1    　　　　In this case, the justification for the delay was strong. The
delay was investigative delay, nothing else. The police may have
2    had some basis to suspect defendant of the crime shortly after it
was committed in 1976. But law enforcement agencies did not
3    fully solve this case until 2002, when a comparison of defendant's
DNA with the crime scene evidence resulted in a match, i.e., until
4    the cold hit showed that the evidence came from defendant. Only at
that point did the prosecution believe it had sufficient evidence to
5    charge defendant. A court should not second-guess the
prosecution's decision regarding whether sufficient evidence exists
6    to warrant bringing charges. "The due process clause does not
permit courts to abort criminal prosecutions simply because they
7    disagree with a prosecutor's judgment as to when to seek an
indictment.... Prosecutors are under no duty to file charges as soon
8    as probable cause exists but before they are satisfied they will be
able to establish the suspect's guilt beyond a reasonable doubt....
9    Investigative delay is fundamentally unlike delay undertaken by the
government solely to gain tactical advantage over an accused
10   because investigative delay is not so one-sided. A prosecutor
abides by elementary standards of fair play and decency by refusing
11   to seek indictments until he or she is completely satisfied the
defendant should be prosecuted and the office of the prosecutor
12   will be able to promptly establish guilt beyond a reasonable doubt."
Indeed, as explained in Lovasco, supra, 431 U.S. at pages 792–795,
13   97 S. Ct. 2044, many legitimate reasons exist why the government
might delay bringing charges even after it has sufficient evidence
14   to convict.

15   　　　　Defendant argues that the DNA technology used here
existed years before law enforcement agencies made the
16   comparison in this case and that, therefore, the comparison could
have, and should have, been made sooner than it actually was.
17   Thus, he argues, the state's failure to make the comparison until
2002 was negligent. We disagree. A court may not find negligence
18   by second-guessing how the state allocates its resources or how
law enforcement agencies could have investigated a given case.
19   "[T]he necessity of allocating prosecutorial resources may cause
delays valid under the Lovasco analysis. [Citation.] Thus, the
20   difficulty in allocating scarce prosecutorial resources (as opposed
to clearly intentional or negligent conduct) [is] a valid justification
21   for delay...." It is not enough for a defendant to argue that if the
prosecutorial agencies had made his or her case a higher priority or
22   had done things a bit differently they would have solved the case
sooner.

23

24   43 Cal. 4th at 1256-57 (some internal citations omitted).  The Court finally went on to find the

25   prosecution's justification far outweighed any prejudice to petitioner:

26   ////

1    In this case, balancing the prejudice defendant has
2    demonstrated against the strong justification for the delay, we find
     no due process violation. We agree with the Court of Appeal's
3    summary: "[T]he delay was not for the purpose of gaining an
     advantage over the defendant. [Citation.] Indeed, the record does
4    not even establish prosecutorial negligence. The delay was the
     result of insufficient evidence to identify defendant as a suspect
5    and the limits of forensic technology. [Citations.] When the
     forensic technology became available to identify defendant as a
6    suspect and to establish his guilt, the prosecution proceeded with
     promptness. Without question, the justification for the delay
     outweighed defendant's showing of prejudice."

7

8    Id. at 1257.

9        3.  Analysis

10         In support of his argument that lengthy pre-accusation delay should be presumed

11   prejudicial, petitioner cites only a speedy trial case.  However, Doggett v. United States, 505 U.S.

12   647 (1992), does not support petitioner's argument.  The Court in Doggett specifically noted that

13   "the Sixth Amendment right of the accused to a speedy trial has no application beyond the

14   confines of a formal criminal prosecution," which is not triggered until the defendant is arrested,

15   indicted or otherwise officially accused.  505 U.S. at 655.   The Court went on to discuss the

16   presumption of prejudice applicable in Sixth Amendment speedy trial cases.  Id. at 655-56.

17   Nothing in Doggett extends that presumption to due process claims such as petitioner's regarding

18   pre-accusation delay.  In fact, the United States Supreme Court has stated that a defendant must

19   prove prejudice to succeed on a due process claim, such as this one.  Valenzuela-Bernal, 458

20   U.S. at 869 (due process claim of pre-indictment delay requires showing of actual prejudice).

21   Certainly, then, the decision of the California Supreme Court refusing to presume prejudice

22   cannot be said to be "contrary to, or involved an unreasonable application of, clearly established

23   Federal law, as determined by the Supreme Court."  28 U.S.C. § 2254(d)(1).

24         In his traverse, petitioner argues he suffered substantial actual prejudice when all

25   aspects of prejudice are considered cumulatively.  (Dkt. No. 17 at 24-28.)  He goes on to discuss

26   three aspects of prejudice.  First, he argues the brain aneurysm he suffered before trial affected

11

his ability to remember past events and to work with his trial attorney.  Second, he argues that the

passage of time rendered other DNA samples on the victim's clothing, which indicated the

presence of a third person, untestable.  Third, he argues that his primary alibi witness, his

mother-in-law, was unable to recall and confirm her statement, given to the police shortly after

the crime, that petitioner was at her home between 4:00 and 6:00 p.m. on the day of the crime.

Petitioner does not establish how each of these problems prejudiced him.  He alleges personal

memory loss from a brain aneurism, but does not specify what aspects of the case he could not

recall, how his memory loss affected his interactions with counsel, or how either of these

problems disadvantaged him at trial.  With respect to the DNA samples, the Court of Appeal

noted that an expert testified at trial that the small amount of an allele,[3] which belonged to neither

petitioner nor the victim, that was detected in three of the victim's sweater stains could have been

the result of something as innocuous as a sneeze.  (LD D, App. A, at 22-23 n.6.)   The court

stated that no foreign alleles were detected in the vaginal swab.  (Id.)  Petitioner provides no

reason to believe that a fresher sample would have produced sufficient DNA from a third party to

have been somehow material at trial.  Finally, with respect to the alibi witness, petitioner

complains that his mother-in-law could not recall that he had been at her home between 4:00 and

6:00 p.m. on the day of the crime.  However, as the Court of Appeal pointed out, his mother-in-

law's statement that petitioner was in her home during that time, which was made to detectives

during the investigation, was admitted into evidence at trial.  (LD D, App. A, at 25.)

Finally, petitioner argues that the stated reason for a substantial part of the delay

in bringing charges against him reflects a reckless disregard for his rights.  (Dkt. No. 17 at 32-

36.)  That reason is essentially that insufficient funding, a backlog of cases, and a policy of

prioritizing the investigation of DNA matches in newer cases prevented the prosecutor from

[3]  As defined by the California Supreme Court, an "allele" is a repetition of a particular pattern of chemical, or "base," pairs found in particular regions, or "loci," of a persons's DNA. 43 Cal. 4th at 1258.

finding the DNA match in this case more quickly.  (Id. at 34 n.16.)  Petitioner cites no case law in support of his argument.  The California Supreme Court held that the "difficulty in allocating scarce prosecutorial resources . . . is valid justification for delay."  43 Cal. 4th at 1256-57.

Petitioner has not shown that the California courts' findings of fact were unreasonable or that the factual and legal conclusions that petitioner did not suffer substantial prejudice, that the delay was justified, or that the prejudice did not outweigh the reasons for the delay were contrary to or an unreasonable application of clearly established federal law. Accordingly, petitioner's claim 1 should be denied.

B. Claim 2 - Admissibility of DNA Statistical Evidence

Petitioner's second claim is that the trial court erred in admitting testimony about the odds that the DNA evidence came from someone besides petitioner because the statistical method used to calculate those odds had not achieved general acceptance in the scientific community.  At trial, these odds were calculated using the "product rule."  Petitioner argues that while the product rule is generally acceptable to calculate the relevant odds when a suspect's DNA is compared to crime scene evidence, it has not gained scientific acceptance when matching crime scene evidence to DNA in a non-random setting such as the cold hit database setting used here.[4]

1. Federal Law

A state court's evidentiary ruling, even if erroneous, is grounds for federal habeas relief only if it renders the state proceedings so fundamentally unfair as to violate due process.

_____

[4]  The California Supreme Court defined the product rule: "Experts use a statistical method called the 'product rule' to calculate the rarity of the sample in the relevant population. . . As the Court of Appeal summarized it, 'The frequency with which each measured allele appears in the relevant population is estimated through the use of population databases.... The frequencies at each tested locus are multiplied together to generate a probability statistic reflecting the overall frequency of the complete multilocus profile.... The result reflects the frequency with which the complete profile is expected to appear in the population.... The result is sometimes expressed as the probability that the DNA of a person selected at random from the relevant population would match the evidentiary sample at all tested loci....'" 43 Cal. 4th at 1259.

1   Drayden v. White, 232 F.3d 704, 710 (9th Cir. 2000); Spivey v. Rocha, 194 F.3d 971, 977-78

2   (9th Cir. 1999); Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991).  "[F]ailure to

3   comply with the state's rules of evidence is neither a necessary nor a sufficient basis for granting

4   habeas relief."  Jammal, 926 F.2d at 919.  "A habeas petitioner bears a heavy burden in showing

5   a due process violation based on an evidentiary decision."  Boyde v. Brown, 404 F.3d 1159, 1172

6   (9th Cir. 2005).

7              2.  California Supreme Court's Opinion

8              The California Supreme Court's opinion first addresses whether it was necessary

9   to determine whether the application of the product rule to a cold hit case has "achieved general

10  scientific acceptance" under the Kelly standard.  43 Cal. 4th at 1257-65.  The Kelly test was

11  created by the California Supreme Court to determine the admissibility of expert testimony based

12  on a new scientific technique.  Id. at 1257-58.  The Court concluded that use of the product rule

13  in a cold hit case has been found reliable.  Id. at 1265.  In other words, the mathematical basis for

14  it is sound.  Id. at 1264.  The Court determined that the real issue in this case is whether the

15  evidence was relevant.  The California Supreme Court concluded it was:

16              Relevant evidence is evidence "having any tendency in
              reason to prove or disprove any disputed fact that is of
17           consequence to the determination of the action."  (Evid. Code, §
              210.)  The test of relevance is whether the evidence tends,
18           logically, naturally, and by reasonable inference to establish
              material facts such as identity, intent, or motive. Under this test,
19           the product rule generates relevant evidence even in a cold hit case.

20              It is certainly correct that, as one treatise that discussed this
              question put it, "the picture is more complicated when the
21           defendant has been located through a database search...." (Modern
              Scientific Evidence, supra, § 32:11, p. 111.) The Jenkins court
22           recognized this circumstance. It explained that in a non-cold-hit
              case, the number derived from the product rule "represents two
23           concepts: (1) the frequency with which a particular DNA profile
              would be expected to appear in a population of unrelated people, in
24           other words, how rare is this DNA profile ('rarity statistic'), and
              (2) the probability of finding a match by randomly selecting one
25           profile from a population of unrelated people, the so-called
              'random match probability.'"

26

14

The court explained that the government had conceded "that in a cold hit case, the product rule derived number no longer accurately represents the probability of finding a matching profile by chance. The fact that many profiles have been searched increases the probability of finding a match." ( Jenkins, supra, 887 A.2d at p. 1018, fn. omitted.) The footnote in the middle of this quotation elaborated: "In other words, the product rule number no longer accurately expresses the random match 'probability.' That same product rule number, however, still accurately expresses the rarity of the DNA profile. Random match probability and rarity, while both identical numbers, represent two distinct and separate concepts. Only one of those concepts is affected by a database search: the random match probability." The court noted that "the 'database match probability' [the approach suggested in the 1996 NRC Report] more accurately represents the chance of finding a cold hit match" and "can overcome the 'ascertainment bias' of database searches. 'Ascertainment bias' is a term used to describe the bias that exists when one searches for something rare in a set database."

Although the product rule no longer represents the random match probability in a cold hit case, the Jenkins court ultimately agreed with the government's argument "that regardless of the database search, the rarity statistic is still accurately calculated and appropriately considered in assessing the significance of a cold hit.... [W]hile a database search changes the probability of obtaining a match, it does not change how rare the existence of that specific profile is in society as a whole.... This rarity is ... both consistent and relevant regardless of the fact that [the defendant's] identification is the product of a database search."

In a non-cold-hit case, we said that "[i]t is relevant for the jury to know that most persons of at least major portions of the general population could not have left the evidence samples." We agree with other courts that have considered the question that this remains true even when the suspect is first located through a database search. The database match probability ascertains the probability of a match from a given database. "But the database is not on trial. Only the defendant is." (Modern Scientific Evidence, supra, § 32:11, pp. 118–119.) Thus, the question of how probable it is that the defendant, not the database, is the source of the crime scene DNA remains relevant. ( Id. at p. 119.) The rarity statistic addresses this question.

Defendant was a potential suspect shortly after Ollie George was murdered in 1976. If modern DNA technology and statistical methods had existed then, law enforcement authorities might have compared his DNA to the crime scene DNA and applied the product rule to obtain the same results ultimately obtained after the database search that actually occurred. The relevance and admissibility of the results obtained in that fashion

> would be beyond question today. The fact that the match ultimately
> came about by means of a database search does not deprive the
> rarity statistic of all relevance. It remains relevant for the jury to
> learn how rare this particular DNA profile is within the relevant
> populations and hence how likely it is that someone other than
> defendant was the source of the crime scene evidence.

43 Cal. 4th at 1266-67 (some internal quotation marks and citations omitted; footnote omitted).

3. <u>Analysis</u>

In support of his arguments, petitioner refers only to state law.[5]  Whether or not the <u>Kelly</u> test was applied or was satisfied in the state courts is not at issue here.  Except for the title of his claim, petitioner makes no argument based on federal due process standards.  (Dkt. Nos. 1, 17.)   This court's analysis of the claim shows the California Supreme Court's decision was not unreasonable and, any event, the trial court's admission of this evidence did not result in fundamental unfairness to petitioner.

The California Supreme Court's decision rests on the reliability and relevance of the statistical evidence in petitioner's trial that showed it was extremely unlikely anyone besides petitioner could have been the source of the DNA evidence.  The court determined that in a cold hit case, the product rule no longer represent the random match probability.  43 Cal. 4th at 1266. However, the product rule used in a cold hit case still appropriately and relevantly stated the rarity of the DNA profile.  <u>Id.</u> at 1267.  Regardless of how the match was made, the statistic showing that petitioner's specific DNA profile was extremely rare in society as a whole was entirely relevant to the jury's consideration of whether the DNA evidence identified petitioner as the perpetrator.  <u>See United States v. Williams</u>, 2008 WL 5382264, *17-19 (C.D. Cal. Dec. 23, 2008) (court considered similar challenge to DNA statistical evidence in a cold hit case; court

---

[5]  In his opening brief before the California Supreme Court, petitioner did cite one federal case, <u>Cooper v. Sowder</u>, 837 F.2d 284, 288 (6th Cir. 1988), for the proposition that the admission of inadmissible and unreliable negative evidence could render a trial fundamentally unfair.   The evidence erroneously admitted in <u>Cooper</u> bears no relationship to the evidence allegedly admitted erroneously here.  While the decision in <u>Cooper</u> shows that it is possible to find a due process violation from the admission of evidence, it does not otherwise support petitioner's claim.

1  held "the rarity statistic is clearly relevant because it informs the jury about how rare the DNA

2  profile is in a population and thus how likely it is that someone other than Defendant was the

3  source of the evidence").  The California Supreme Court's decision was thorough and well-

4  considered.  There is no indication it was contrary to or an unreasonable application of clearly

5  established federal law or based on an unreasonable application of the facts.   For these reasons,

6  petitioner's claim 2 should be denied.

7       C.  Claim 3 - DOJ Allegedly Improperly Tested and Determined Significance of DNA
        Evidence
8

9           Petitioner's next claim is that the trial court erred in ruling that the Department of

10  Justice's Crime Lab properly tested the DNA evidence in accordance with generally accepted

11  procedures and properly interpreted the significance of that evidence.  Respondent argues

12  petitioner failed to raise this claim before the California Supreme Court and it is therefore

13  unexhausted.  That assertion appears to be true.  Petitioner made the claim to the California

14  Court of Appeal.  (LD A at 95-97.)  The Court of Appeal noted that petitioner's argument rests

15  on the third prong of the Kelly test discussed above regarding the admissibility of expert

16  testimony.  (LD D, App. A, at 54.)  Because the court had rejected petitioner's claim at the first

17  prong of the Kelly test, it stated that it need not reach the third.  (Id. at 55.)

18           This court may address an unexhausted claim if it is meritless.  28 U.S.C. §

19  2254(b)(2); Cassett v. Stewart, 406 F.3d 614, 624 (9th Cir. 2005) (a federal court considering a

20  habeas petition may deny an unexhausted claim on the merits when it is perfectly clear that the

21  claim is not "colorable").  This claim is meritless.  As described above with respect to claim 2,

22  petitioner has made no showing that admission of the DNA evidence rendered his trial

23  fundamentally unfair.  Accordingly, Claim 3 should be denied as well.

24       D.  Claim 4 - Use of Three Major Ethnic Groups in DNA Statistic

25           Petitioner's final claim is that the trial court erred by allowing the prosecution to

26  present statistical evidence with respect to three major ethnic groups, rather than with respect to

17

1   the general population.  As described above with respect to claim 2, this court will not consider a

2   state court's evidentiary ruling unless it rendered petitioner's trial fundamentally unfair.

3   Petitioner has not shown the trial court's ruling was unfair.

4           1.  <u>State Court Opinion</u>

5           Petitioner raised this claim before the Court of Appeal, who rejected it.  He

6   included it in his petition for review before the California Supreme Court, who denied review of

7   the claim.  (LD D at 22-24, LD E.)  Therefore, the Court of Appeal decision is the last reasoned

8   state court opinion on this issue.  <u>Avila v. Galaza</u>, 297 F.3d 911, 918 (9th Cir. 2002).  The Court

9   of Appeal first noted that the California Supreme Court approved the practice of providing

10  frequency evidence as to the three main population groups in <u>People v. Wilson</u>, 38 Cal. 4th 1237,

11  1244-50 (2006).  (LD D, App. A, at 56.)  The court then noted:

12              Moreover, contrary to defendant's claim, presenting
            frequencies for the major population groups did not infer that the
13          murderer in this case and defendant "shared the same race."  The
            jurors were presented with evidence of the expected frequency of
14          the 13-loci profile for each of the three major population groups.
            The testimony and argument did not focus the statistical analysis
15          on any particular population group; rather, it was presented solely
            to show the overall rarity of the profile in any of the groups.
16          Nothing in the testimony or the arguments suggested that the DNA
            evidence could indicate the race of the perpetrator.  Because the
17          jurors were told of the rarity of a DNA profile in the three major
            population groups and the rarity of the frequency in any group, they
18          could not bootstrap themselves into believing that the murderer
            must have belonged to defendant's racial group.
19
                Where, as here, the evidence demonstrates that the profile
20          is extraordinarily rare in all three major population groups, the only
            inference the jury could draw was that the profile is extraordinarily
21          rare in the population as a whole.  The fact a DNA profile is very
            rare in any of the three major population groups tends to
22          demonstrate that the profile is rare in the population as a whole
            and, therefore, meets the standard of relevance.
23

24  (LD D, App. A, at 56-57.)

25  ////

26  ////

1        2. Analysis

2        Petitioner has not shown how introduction of the population group statistics

3 rendered his trial fundamentally unfair.  Nothing in the statistics required the jury to infer

4 petitioner or the perpetrator was a member of a particular racial group.  In fact, using all three

5 statistics seems likely to have had the opposite effect.  As noted by the Court of Appeal, the one

6 inference to be drawn was that the DNA profile was extremely rare, regardless of race.  Petitioner

7 has not shown this inference was inappropriate or otherwise unfair.

8        Petitioner has not established that the Court of Appeal's decision was contrary to

9 or an unreasonable application of federal law or an unreasonable construction of the facts.

10 Accordingly, Claim 4 should be denied.

11 VI.  Conclusion

12        For all of the above reasons, IT IS HEREBY RECOMMENDED that petitioner's

13 application for a writ of habeas corpus be denied.

14        These findings and recommendations are submitted to the United States District

15 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-

16 one days after being served with these findings and recommendations, any party may file written

17 objections with the court and serve a copy on all parties.  Such a document should be captioned

18 "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files

19 objections, he shall also address whether a certificate of appealability should issue and, if so, why

20 and as to which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if

21 the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. §

22 2253(c)(3).  Any response to the objections shall be filed and served within fourteen days after

23 service of the objections.  The parties are advised that failure to file objections within the

24 ////

25 ////

26 ////

                                    19

1   specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951

2   F.2d 1153 (9th Cir. 1991).

3   DATED:  July 22, 2011

4   _____

    KENDALL J. NEWMAN

5   UNITED STATES MAGISTRATE JUDGE

6   john2035.157

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26